Filed 11/24/14  P. v. Molina CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>FRANCISCO MOLINA,<br><br>        Defendant and Appellant. | B250737<br><br>(Los Angeles County<br>Super. Ct. No. BA398296) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Clifford L. Klein, Judge.  Affirmed.

Randy Short, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Francisco Molina of two counts of engaging in sexual penetration upon a child in violation of Penal Code section 288.7, subdivision (b) (counts 1 & 2)[1] and two counts of committing a lewd or lascivious act upon a child in violation of section 288, subdivision (a) (counts 3 & 4). The trial court sentenced defendant to a total sentence of 30 years to life, consisting of 15 years to life in each of counts 1 and 2. The court imposed concurrent midterms of six years in counts 3 and 4.

Defendant appeals, alleging several instances of ineffective assistance of counsel. He also argues he was prejudiced by the complaining witness's extrajudicial statements being entered into evidence without limitation and by the cumulative effect of trial counsel's errors.

## FACTS

**Prosecution Evidence**

C. is the child of G. and W., who separated in 2010. They also had a son, A. C. was nine years old at the time of trial. Before her parents separated, C. lived on Dalton Street in Los Angeles with her parents, brother, uncle, and grandparents. The Dalton Street house belonged to C.'s grandparents, who are defendant and Abigail.[2] When her parents separated, C. at first went to live with G. In December 2011, W. obtained custody of C. and A., and they went to live with him in the Dalton Street home.

The Dalton Street home had only one bedroom, where W. slept with his children. The uncle slept on the floor of the closet in the same room. The grandparents slept on a bed in the living room. C. testified that when she was seven years old, defendant began to touch her private parts.

C. testified that defendant would insert his fingers in her "front part" and move them from side to side. He did this "more than two times" while they were either on her grandmother's bed or her father's bed. C. did not want defendant to do this to her, but

---

[1]    All further references to statutes are to the Penal Code unless stated otherwise.

[2]    C. said her grandmother's name was Abigail, but G. referred to her former mother-in-law as "Margarita."

2

she was scared of getting in trouble. More than three times, defendant rubbed his front private part inside her "butt" after pulling down her clothing. Defendant would put a blanket over himself and C. Once defendant grabbed C.'s hand and made her touch his front part, but she immediately removed her hand. He once he kissed her neck. Defendant told C. not to tell anybody because it was just a game. C. said defendant once tricked her into getting on the bed by telling her she was too close to the television. When she went to the bed, defendant also got in bed, and he molested her. C. remembered the incidents happening before the Christmas preceding her eighth birthday in March of the following year. The last incident was in the month of January.

On April 20, 2012, C.'s "private" began hurting, and C. complained to G. G. checked and saw that C.'s vagina looked red and irritated. G. told C. that she did not clean herself properly. G. asked if she was okay. C. said "yes," but then lay down and began to cry. G. asked C. to tell her if something was going on, and she said, "It's because of my grandpa." She said he was touching her private parts. C. said she was scared that "they're going to get mad at me."

G. immediately called W. G. stepped away while C. told W. about the molestations. C. was shaking and crying as she told her father, and he began to cry as well. G. took C. to be checked by a doctor at Children's Hospital. The doctor did not prescribe anything but told G. to keep C. clean and put clean clothing on her. The doctor found C.'s private parts to be "a little bit irritated."

Los Angeles Police Officer Jose Campos was dispatched to the hospital. He spoke with C., who told him that between January and March 2012, her grandfather had touched her private parts. C. estimated that it had occurred about six times in either his bedroom or hers. He would wrap a blanket around the both of them and touch her vaginal area and insert his fingers in her vagina. On most occasions, he would also pull down her pants and rub his penis on her anal area, and at one point he had her touch his penis. Officer Campos did not take C. to a sexual assault treatment center because of "the lapse in time of the assaults."

3

A police investigator, Detective Victor Acevedo, also spoke with C. and G. C. was alone when interviewed, and she described the same incidents of molestation she had related to Officer Campos. Detective Acevedo telephoned defendant and said he needed to speak to him about an incident with his granddaughter C. Defendant was very receptive and voluntarily met with Detective Acevedo at the police station on May 31, 2012. Defendant came with his wife, who waited outside as defendant was interviewed. In the waiting room, Detective Acevedo told defendant that "it was a voluntary statement, that he was free to leave, and that he could terminate the interview on his own accord."

Detective Acevedo confronted defendant with the allegations that C. had made. Defendant initially denied them and said, he "did not do any of those things." Then he remained quiet and said, "I might have touched her." According to Detective Acevedo, defendant "kind of went more not directly saying yes, but maybe and might have happened unintentionally. Those were his words." Eventually, he stated "that he touched C.'s vagina approximately two times and that he did have contact with her buttocks with his erect penis, but it was over the clothing." He put his finger in her vagina for seconds only. Detective Acevedo did not ask defendant about taking C.'s hand and putting it on his penis. Defendant admitted telling C. not to tell anyone and that it was a game.

Detective Acevedo believed he had recorded the interview. He set the recorder, but it failed to record the interview except for the first few seconds. The interview lasted 25 to 30 minutes. Detective Acevedo reset the recorder and summarized the unrecorded interview with defendant on the new recording, which lasted about seven minutes and was played for the jury.

Dr. Jayme Jones, a clinical psychologist, explained the sexual abuse accommodation syndrome, which is a model used to help people understand the behavior of children who have been sexually abused. When given a hypothetical based on the facts of defendant's case, Dr. Jones was of the opinion that C. was unlikely to disclose the abuse because she has positive feelings for her grandfather. Living in her grandfather's house would increase a sense of helplessness. She would not be expected to tell anyone or to act differently around others.

4

**Defense Evidence**

W. testified that he gained custody of C. and her brother in January 2012. The children stayed with him Monday through Friday and with G. on the weekends. His mother took the children to school—never his father—and W. picked them up after school and took them home. W. worked from 4:45 a.m. until 1:45 p.m. W. stayed at home with the children in the afternoon and evening. He was always there and did not have his mother or father watch them. W. put the children to bed at 8:00 p.m., and he went to bed at the same time. W. could not remember a single time that he left his children alone with his father or his father and brother. W. testified that he did the laundry every Saturday morning. The children were with their mother. He did not go to the grocery store because either his mother or father would go.[3]

C. never complained to W. about having pain in her private area. There was no downturn in her school performance, and she never showed any aversion to being around defendant. The allegations only began after W. gained custody of his children. When G. had custody, W. paid her $980 in child support, but he no longer paid her. G. had not tried to win custody of the children since the abuse was disclosed.

W. acknowledged that when he had custody, there were weekends when G. did not feel like picking up the children, and they spent the weekend with him. This happened approximately twice a month. If he took his mother to the laundromat, his sister, who visited every weekend, would watch the children. He could not say if his sister left the house without his children, but he did not think she did. W. later testified that when G. did not pick up the children, he would do laundry on Mondays. W. admitted he sometimes "went outside," but stated that his mother or brother would be home then. If he had to run an errand or go to the doctor, his children were always with him.

---

[3]     When asked where her father and grandmother were when the abuse occurred, C. said they were grocery shopping or doing the laundry.

5

## DISCUSSION

## I. Cross-Examination of Complaining Witness

### A. Defendant's Argument

Defendant contends trial counsel was ineffective in that he failed to cross-examine C. or G. in any meaningful way to establish reasonable doubt about their veracity.[4]

### B. Relevant Authority

"To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citations.] '[W]here the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] 'In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.' [Citation.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 288.)

"As the United States Supreme Court noted in *Strickland v. Washington* [(1984) 466 U.S. 668]: 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*People v. Lewis*, *supra*, 50 Cal.3d at p. 288.)

---

[4] Although defendant initially mentions a failure to cross-examine G., he presents no specific instances of this alleged failure. Hence, we address only his arguments regarding the cross-examination of C.

## C. Counsel Not Ineffective

Defendant complains that trial counsel made no attempt to refresh C.'s memory as to her preliminary hearing testimony, during which she stated many times that she did not recall certain details of the abuse, or to impeach her with the transcript of the hearing. He asserts that counsel's failure to establish the witness's lack of memory fell below professional standards and was prejudicial to him.

Defendant asserts that counsel also failed to ask about the precise circumstances and dates of each of the sexual abuse incidents and the reason defendant's statement that it was a game caused C. to be silent. Defendant provides a list of 10 questions he believes counsel should have asked.[5] According to defendant, if trial counsel had questioned C. effectively, a reasonable doubt of his guilt could have been established for at least one juror.

Whether to cross-examine a witness with certain questions is a tactical matter well within the defense counsel's purview. (See, e.g., *People v. Beagle* (1972) 6 Cal.3d 441, 458.) The instant case is not one where "there simply could be no satisfactory explanation" for counsel's decision. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) It is probable defense counsel saw there was little to be gained by appearing to badger C. and made a tactical decision not to pepper her with the type of questions defendant sets forth in his brief. To the jury, C. undoubtedly appeared to be sympathetic and vulnerable. Any attempt to try to pin the child down to specific times and acts at her young age would have appeared unfair and even humiliating, causing a backlash against defendant. Nor was there much to be gained by pointing out relatively minor inconsistencies in C.'s

---

[5]    Defendant's suggested questions for C. are: "When was the first time, the second time, the third time, and so forth? What precisely occurred the first time, the second time, the third time and so forth? Was there truly penetration of the vagina or rectum? If so, when and how many times? Where were the other family members? Why did she not immediately tell her parents nor other authority figures? Was it truly because appellant told her not to tell because it was just a game? Did she believe it was just a game? Did she know what her grandfather was doing was improper?"

7

recollection of the details surrounding each and every incident of molestation, not to mention the fact that such questioning would repeatedly drive home the details of the sexual abuse. "'"'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings."'"'" (*People v. Frierson* (1979) 25 Cal.3d 142, 158.) In any event, defense counsel did cross-examine C. on some key inconsistencies in her pretrial statements—indeed, there were 11 pages of C.'s cross-examination. In addition, counsel's closing argument stressed the inconsistencies in C.'s overall account, including her lapses in memory regarding certain details of the incidents.

We cannot therefore conclude that counsel was unreasonable in his tactical choices with this child victim. Under the circumstances, this was the best course of action available, and counsel steered clear of a style of questioning that would probably have done more harm than good. "A defendant is entitled only to a fair trial with competent representation. Counsel, in order to appear competent, need not indulge in idle [or risky] acts." (*People v. Wallin* (1981) 124 Cal.App.3d 479, 484.) Moreover, since the reasons for counsel's decisions are not in the record, the judgment should be affirmed in any event. (*People v. Ledesma* (2006) 39 Cal.4th 641, 746; *People v. Jones* (2003) 30 Cal.4th 1084, 1115; *People v. Mendoza Tello* (1997)15 Cal.4th 264, 266-268.)

Defendant's claim of ineffective assistance may also be disposed of on the ground that he has failed to show sufficient prejudice. (*People v. Kipp* (1998) 18 Cal.4th 349, 366.) We believe that if more inconsistencies in C.'s testimony compared to the preliminary hearing testimony had been brought out it would not have changed the verdict. The jury was instructed on imperfect memory with CALCRIM No. 226 and given guidance on evaluating a child witness with CALCRIM No. 330. The jury no doubt took these instructions into account. The evidence against defendant was overwhelming, since he admitted the most crucial elements of C.'s testimony. Defendant cannot show that, but for his attorney's performance, there is a reasonable probability the result would have been different.

## II. Complaining Witness's Motive to Lie

### A. Defendant's Argument

Defendant argues that trial counsel, in his cross-examinations of C. and G., failed to make any link between the child custody issues with C. and a motive to falsely accuse defendant—this despite counsel's implications in closing argument that the change in custody was C.'s motive for lying.

Defendant also contends counsel completely failed to pursue another potential motive for false accusations: that C. was upset about her mother accusing her of poor hygiene. According to defendant, counsel should have asked more questions about the hygiene issue.[6]

### B. Relevant Authority

An attorney representing a criminal defendant has the power to control the court proceedings, and defendant must do more than allege poor tactics on the part of his trial attorney or suggest more effective ways of handling the case in order for this court to find ineffective assistance. (*People v. Kirkpatrick* (1972) 7 Cal.3d 480, 486; *People v. Floyd* (1970) 1 Cal.3d 694, 704; *People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 173.)

### C. Counsel Not Ineffective

As stated previously, counsel was likely wary of appearing to harass the child victim. A child witness is not merely a small adult who can be asked the same types of questions in the same manner. Also, counsel faced the problem that G. had made no move to regain custody of her children and W.'s financial support after C. accused defendant of molesting her. Counsel used the fact of the lost support as well as he could

---

[6] Defendant suggests counsel should have asked C. whether there had been a long-term hygiene issue, whether C. was punished in the past for not keeping clean, whether C. was ashamed of herself for not keeping clean, whether she created a sexual abuse claim to divert her mother's attention from her lack of cleanliness and to avoid further embarrassment or punishment, and whether defendant was telling the truth when he said he may have unintentionally touched her private parts while both were clothed and C. exaggerated the inadvertent touching.

9

by planting the seed in the jurors' minds that such a motive was possible and leaving it at that.

As for exploiting the mention of C.'s possible lack of hygiene, there was no profit in humiliating the victim on this point. Moreover, there was no evidence that G. scolded C. for a lack of hygiene to the degree that C. would be motivated to invent an elaborate story to escape blame.

It appears from the record that counsel was aware that both of these theories of motive were not of much benefit and emphasized instead defendant's lack of opportunity to engage in the sexual offenses due to the impossibility of defendant's finding a time when he could be alone with C. or C. and her younger brother. As noted, "'[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]'" (*People v. Lewis*, *supra*, 50 Cal.3d at p. 288.) Here, defendant has failed to carry his burden to affirmatively show error. "'There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' [Citation.]" (*People v. Lewis*, *supra*, 50 Cal.3d at p. 288.) Accordingly, defendant's claim of ineffective assistance of counsel fails.

## III.  Complaining Witness's Extrajudicial Statements

### A.  Defendant's Argument

Defendant contends that C.'s out-of-court statements were presented to the jury as substantive evidence without limitation because the trial court erred by reading CALCRIM No. 303[7] while failing to inform the jury of the testimony to which it applied.

---

[7]    The trial court read CALCRIM No. 303 to the jury as follows:  "During the trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and no other."

10

Defendant next contends the prosecution brought forth several out-of-court statements made by C. without objection or pertinent cross-examination by defense counsel. According to defendant, all of these statements were extremely damaging hearsay evidence that violated defendant's statutory rights and constitutional right to confront witnesses, since the court instructed the jury that the prior statements were being offered for credibility issues and for the truth of the matter.[8] Defendant asserts that, had the jury only considered C.'s trial testimony, there would have been a reasonable likelihood of a more favorable outcome.

### B. C.'s "Fresh Complaint" and the Limiting Instruction

The trial court permitted G. to testify that C. complained to her of pain in her vaginal area and, when G. questioned her, C. said that her grandfather had touched her private parts. The statement was admitted under the "fresh complaint" exception to the hearsay rule, and G. was not permitted to testify to details of the sexual acts. (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*); *People v. Burton* (1961) 55 Cal.2d 328, 351.)

"[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Brown*, *supra*, 8 Cal.4th 746, 749-750.) Our Supreme Court has emphasized that "evidence of the victim's report or

---

[8] The trial court read CALCRIM No. 318 to the jury as follows: "You heard evidence of statements that a witness made before the trial. If you decide the witness made those statements, you may use those statements in two ways: one, to evaluate whether the witness's testimony in court is believable, and, two, as evidence that the information in those earlier statements is true." The court also read CALCRIM No. 226, which lists factors for the jury to consider in evaluating a witness's testimony, among which is the following factor: "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?"

11

disclosure of the alleged offense should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose." (*Id.* at p. 763) G.'s testimony was properly admitted under this doctrine and was nonhearsay. Her testimony sufficiently lacked detail so as to avoid being classified as hearsay and were therefore admissible under *Brown*.

Defendant argues that the court erred by failing to inform the jury that it was this fresh complaint testimony that was to be limited in purpose and use. This allowed the jury to use C.'s statement for the truth of the matter asserted. As stated in *Brown*, a trial court has no sua sponte duty to provide a limiting instruction with respect to fresh complaint evidence. (*Brown*, *supra*, 8 Cal.4th at p. 757; see also *People v. Manning* (2008) 165 Cal.App.4th 870, 880.) During the discussion of jury instructions, the *prosecutor* requested that the trial court read CALCRIM No. 303 regarding the fresh complaint statement and the expert testimony. The court noted that there had been no request for it when the evidence was presented, but stated it would give the instruction anyway, and the parties could clarify it in argument. Thus, the record shows that defendant did not request such an instruction at the time the evidence was presented and did not object to the content of the instruction at the close of trial. He therefore forfeited any complaint regarding this instruction. Furthermore, the prosecutor explained during closing argument, "There were two things that were admitted for a limited purpose, and [one] was [G.]'s statement that [C.] said Grandpa sexually abused her. That was for a limited purpose that the complaint was made." We disagree with defendant that the giving of CALCRIM Nos. 200 and 222,[9] which instruct the jury to follow the court's

---

[9]      CALCRIM No. 200 was read in pertinent part as follows: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

CALCRIM No. 222 was read in pertinent part as follows: "Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

instructions if the attorneys' comments conflict and that nothing the attorneys say is evidence, effectively told the jury it had a duty to disregard the prosecutor's explanation. did not conflict with the jury instruction, and it did not purport to be evidence in itself. Her explanation was actually helpful to the defense. Therefore, defendant was not prejudiced by the lack of a more detailed instruction.

Defendant argues that because the hearsay affected defendant's substantial rights— to confront and cross-examine witnesses and to due process—counsel's lack of objection to the court's failure to identify the fresh complaint testimony as the evidence being limited does not prevent review. Although we have identified grounds for forfeiture, we have not denied review, having found that defendant was not prejudiced by the challenged instruction even if error occurred. Defendant's claim on this point must therefore fail.

Defendant cites the same alleged trial court error as a violation of defendant's confrontation right. He argues that C.'s statements to her mother were testimonial in nature because it is reasonable to believe that G.'s questioning of her daughter would have elicited a statement that would be available for use in prosecution. We disagree.

In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court held that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements." (*Id*. at p. 59, fn. 9.) C. testified in the prosecution's case-in-chief and was cross-examined. Also, *Crawford* does not apply to nonhearsay statements admitted under the fresh complaint doctrine because the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Id*. at p. 59, fn. 9.) Though no comprehensive definition of testimonial has been articulated, *Crawford* notes that at a minimum, it includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id*. at p. 68.) These concrete examples show that a testimonial statement requires a more formal setting than a conversation between a child and her mother. (*Id*. at pp. 51-52.)

13

## C. C.'s Other Out-of Court Statements

Defendant next contends that the prosecutor asked Officer Campos questions eliciting narrative answers and clear hearsay, with the result that Officer Campos gave detailed testimony regarding C.'s out-of-court statements without objection. In addition, the prosecutor asked Detective Acevedo what C. said about the sexual abuse without a hearsay objection from defense counsel or thorough cross-examination. Defendant also points out that the prosecutor asked C. on direct examination about being questioned by police officers at the hospital and elicited that C. had told them "the truth." The prosecutor also elicited that C. recalled being questioned by Detective Acevedo, and she confirmed that she told him "the truth." C. also informed the jury she had recently met with the prosecutor and Detective Acevedo in the prosecutor's office and told them "the truth." Counsel did not object or cross-examine with regard to these extremely damaging prior consistent statements without foundation, which were admitted in violation of Evidence Code sections 791 and 1200.[10] Defendant argues that counsel's failure to object to this hearsay was also a violation of his constitutional right to confront witnesses under *Crawford*.

Absent an express or implied charge that a witness's trial testimony is recently fabricated or influenced by bias or improper motive, evidence of a prior consistent statement is not admissible. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219, fn. 6; *People v. Frye* (1985) 166 Cal.App.3d 941, 950.) "[A] prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony." (*People v. Hayes* (1990) 52 Cal.3d 577, 609; Evid. Code, § 791.)

---

[10] Defendant also says the statements were admitted in violation of Evidence Code section 1231, but this must be an error, since that section addresses decedents' sworn statements regarding gang-related crimes.

14

Defendant must overcome presumptions that counsel was effective and that the challenged action might be considered sound trial strategy. (*In re Jones* (1996) 13 Cal.4th 552, 561.) We consider counsel's overall performance throughout the case, evaluating it from counsel's perspective at the time of the challenged act or omission and in light of all the circumstances. (*People v. Bolin* (1998) 18 Cal.4th 297, 335.) "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation.]" (*Id.* at p. 333; see also *People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

Officer Campos succinctly recounted C.'s statement at the hospital—an account that was largely consistent with her trial testimony. Detective Acevedo's testimony regarding C.'s statements was extremely brief, since the bulk of his testimony was devoted to defendant's admissions. Had defense counsel objected, the prosecutor could have sought admission of the prior statements to Detective Acevedo and to Officer Campos under Evidence Code section 1360, which provides a hearsay exception for statements by children under the age of 12 in child abuse cases.[11] Thus, the evidence was

---

[11]     Evidence Code section 1360 provides, in pertinent part: "(a)  In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:  [¶] (1) The statement is not otherwise admissible by statute or court rule.  [¶]  (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content and circumstances of the statement provide sufficient indicia of reliability.  [¶]  (3) The child either:  [¶]  (A) Testifies at the proceedings.  [¶]  (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.  [¶]  (b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement."

not inadmissible per se. (See, e.g., *People v. Dykes* (2009) 46 Cal.4th 731, 757-758 [defendant's hearsay arguments regarding witness's statements erroneously assume prosecutor could not have demonstrated admissibility under other provisions of the Evidence Code].) As in *Dykes*, however, we need not speculate whether the prosecutor could have established the proper foundation for these statements because the admission of C.'s statements to the police was harmless in light of defendant's admissions to Detective Acevedo and C.'s compelling testimony. (see *Dykes*, at p. 759.)

Defendant also appears to object to C.'s statements, elicited by the prosecutor, that she told the truth to officers at the hospital, to Detective Acevedo, and to the prosecutor herself. Given that admission of the statements to Detective Acevedo and Officer Campos were harmless beyond a reasonable doubt, we perceive no prejudice in allowing the prosecutor to question C. about her truthfulness on those occasions.

Defendant has not demonstrated that it was reasonably probable that exclusion of the consistent statements would have led to a more favorable verdict. Therefore, defendant suffered no prejudice and counsel cannot be found ineffective. Likewise, we conclude defendant's constitutional right to confront witnesses and to due process were not violated. "The Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." (*California v. Green* (1970) 399 U.S. 149, 158; see also *People v. Hayes*, *supra*, 52 Cal.3d at p. 610.)

## IV. Defendant's Incriminating Statements

### A. Defendant's Argument

Defendant contends his trial counsel was prejudicially ineffective in defending against his incriminating statements to Detective Acevedo. He makes several arguments under this rubric: (1) counsel was ineffective for failing to file a *Pitchess*[12] motion regarding Detective Acevedo; (2) counsel was ineffective for failing to file a motion to

---

[12]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 537-538 (*Pitchess*).

16

suppress the statements, since defendant received no *Miranda*[13] advisement; (3) counsel failed to thoroughly cross-examine Detective Acevedo; and (4) a false confession expert should have been called to testify on behalf of defendant, since his statements were equivocal and ambiguous.

### B. Pitchess *Motion*

Assuming defense counsel could have produced an affidavit with information sufficient to trigger discovery of some type of prior police misconduct on the part of Detective Acevedo, defense counsel's failure to do so does not equate to ineffective assistance.[14] The record contains no evidence from which an inference could be drawn that a successful *Pitchess* motion would have elicited evidence of one or more prior instances of relevant improper conduct by the detective. Even if the *Pitchess* motion uncovered personnel complaints against Detective Acevedo, defendant has failed to show the result of the trial would have been different. The evidence against defendant was very strong. In addition, Detective Acevedo's testimony was corroborated by the recording played for the jury. Thus, defendant has failed to show any "possible prejudice" flowing from the failure to file a timely *Pitchess* motion. (See *In re Avena* (1996) 12 Cal.4th 694, 730.)

In the context of a failure to investigate a claim, an appellant "must demonstrate that counsel knew or should have known that further investigation was necessary, and must establish the nature and relevance of the evidence that counsel failed to present or

---

**13** *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

**14** In *Pitchess*, the California Supreme Court held that a criminal defendant is entitled to discovery of the personnel files of officers if the information contained in the records is relevant to the defendant's ability to defend against the charge. (*Pitchess*, *supra*, 11 Cal.3d at pp. 535-536.) The trial court determines whether there is good cause for the disclosure. (Evid. Code, § 1043; *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.) Good cause for such discovery is shown "'first by demonstrating the materiality of the information to the pending litigation, and second by "stating upon reasonable belief" that the police agency has the records or information at issue. [Citation.]'" (*Zanone v. City of Whittier* (2008) 162 Cal.App.4th 174, 187.)

17

discover." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)  Defendant must show specifically what would have been uncovered and that the failure to discover or present the evidence was prejudicial.  (*Ibid*.)  The failure to make the motion is not enough.

Accordingly, defendant cannot show a reasonable probability that a more favorable determination would have been made had his counsel brought a *Pitchess* motion.  Because the record does not reveal that defense counsel's representation fell below an objective standard of reasonableness in this regard under prevailing professional norms, his claim of ineffective assistance of counsel is rejected.

### C.  *Lack of* **Miranda** *Warnings*

*Miranda* warnings are required only when a person is subjected to custodial interrogation.  (*Miranda*, *supra*, 384 U.S. at p. 444.)  "Custody" in this context includes actual custody and any situation in which a person has been deprived of his freedom of action in a significant way.  (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)  Not all police inquiries amount to interrogations that require *Miranda* warnings.  Preliminary inquiries seeking to obtain identifying information or to investigate a suspicion of criminal conduct, may not require *Miranda* warnings.  (*People v. Morris* (1991) 53 Cal.3d 152, 198, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)  The rule excluding preliminary inquiries from the scope of *Miranda* "recognizes the value of routine and nonintrusive police inquiry before arrests and accusations are made.  Such inquiry serves to minimize mistakes and protect the innocent."  (*Morris*, at p. 198.)

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation.]"  (*Stansbury v. California* (1994) 511 U.S. 318, 322.)  "*Miranda* warnings are not required 'simply because the questioning takes

place in the station house, *or because the questioned person is one whom the police suspect.*' [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 402.)[15]

Under the totality of the circumstances here, defendant was not in custody when police spoke with him. Detective Acevedo was the only police officer in the room, and nothing in the record suggests that he attempted to intimidate, place pressure on, or threaten defendant. Defendant was not physically restrained during the interview of approximately half an hour. Defendant came voluntarily to the interview and his wife was waiting for him, indicating that he believed he was free to leave. Indeed, he was told he was free to leave. Under these circumstances, a reasonable person in defendant's position would not have considered himself to be in police custody. Therefore, any motion to suppress defendant's admissions would have been without merit, and counsel is not required to file meritless motions to avoid later claims of ineffective assistance. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 726.) Counsel was not ineffective.

### D. Cross-Examination of Detective Acevedo

Defendant criticizes trial counsel for not thoroughly cross-examining Detective Acevedo. As we have noted, counsel may have had tactical reasons for limiting his

---

[15]    Courts have identified a variety of circumstances relevant to the determination of whether the defendant was in custody, including the following: "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.) No single factor is dispositive; their interplay and combined effect must be assessed. (*Ibid.*)

19

cross-examination to the questions he asked.  Therefore, the judgment must be affirmed.  (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 746; *People v. Jones*, *supra*, 30 Cal.4th at p. 1115.)  Defendant suggests challenging questions that should have been asked regarding the malfunctioning recorder.[16]  He also suggests questions regarding the detective's investigatory tactics.[17]  Defendant asserts his statement is riddled with ambiguities and uncertainty, and counsel should have questioned the detective as to each of the equivocal statements.  Defendant again presents a litany of questions counsel should have asked.[18]

Detective Acevedo's testimony and the recorded portion of the interview clearly showed defendant had admitted the acts of molestation described by C.  It is highly likely counsel did not wish to have the sordid minutiae of defendant's acts repeated and analyzed so as to ingrain them in the minds of the jury members.  As for the tape recorder malfunction, Detective Acevedo explained what had happened, and his testimony indicates there was little more to be said on the subject, leaving a credibility issue for the jury to resolve.  The questions suggested by defendant have the transparent purpose of

---

[16]  "Was it really a malfunction or an intentional act of the detective?  Did the detective intentionally fail to record the interview to allow him to manipulate the appellant without having his tactics and methods scrutinized?  Had this type of recording malfunction occurred in any of his previous interviews with suspects?  Did the recorder have an indicator for how much memory was available?  If so did he view it prior to recording appellant's statement?  Was the recorder available for the jury to view?  Did the detective take notes during the first interview?"

[17]  "Did the detective's method of interrogation cause the appellant to change from statements of complete denial to admitting to portions of the victim's allegations?  How much information about the victim's statements had been told to appellant?  If appellant sat silently and then made incriminating statements, then why did it take 25-30 minutes for him to give the first statement when the second statement was only 7 minutes?"

[18]  A few of the questions defendant suggests are:  "Were the statements made during the first interview similar in their uncertainty as the second statement?  What were the exact words used when appellant admitted acts of sexual abuse?  If appellant did not say his penis was erect, but that he was aroused, what exactly was said about the arousement [*sic*]?  Why did appellant not admit arousal in the tape recorded statement when he was asked if he was aroused when he touched her private areas?  (CT 97)"

20

impugning the detective's honesty, and it is unclear what counsel would have gained by doing so, except to imply to the jury by means of his questions that the detective had deliberately not recorded the interview and was lying about defendant's statements. The manner of cross-examination is within counsel's discretion and "'rarely implicate[s] ineffective assistance of counsel.'" (*People v. Mai*, *supra*, 57 Cal.4th at p. 1018.) Defense counsel did elicit that most of the interview was not recorded. Counsel also posed questions designed to determine if defendant had been manipulated. Counsel asked the detective if anything had been promised to defendant—such as that he would be free to go if he admitted everything—and whether the detective had employed ruses or outright lies. Defendant chose not to testify and thus did not deny the truth of his interview statements, and no other evidence was offered to call into question the admissions. Defendant's list of questions that were not asked does not persuade us to conclude counsel's cross-examination of the detective amounted to ineffective assistance.

As for defendant's claim that his recorded statement was not a clear and unequivocal confession to the molestation allegations, and that trial counsel should have established by means of investigation, expert testimony, questioning, and evidence that the admissions were the result of manipulation, we conclude that defendant has not shown that counsel did not investigate this issue and determine that his limited questioning of the detective was the appropriate strategy. In the seminal case regarding ineffective assistance of counsel, the California Supreme Court stated that a reviewing court "should avoid second-guessing counsel's informed choice among tactical alternatives" and should only conclude performance was constitutionally deficient if "trial counsel makes a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases." (*People v. Pope* (1979) 23 Cal.3d 412, 424.) We do not reach that conclusion in defendant's case.

### E. False Confession Expert

In *People v. Linton* (2013) 56 Cal.4th 1146 (*Linton*), the Court considered a claim that exclusion of expert testimony about false confessions was an abuse of discretion and violated the defendant's right to present a defense. The *Linton* court rejected the claim,

21

concluding that where there was a "dearth of evidence indicating a false admission or confession," as well as a "multitude of corroborative evidence . . . that suggested defendant's admissions and confession were true." (*Id*. at p. 1182.) Under these circumstances, "it fell within the trial court's broad discretion to determine that [the expert's] proffered testimony had, at most, minimal probative value, which was substantially outweighed by its likely undue consumption of time. [Citations.]" (*Ibid*.)

Likewise, in the instant case, there was a dearth of evidence indicating that defendant's confession was false. Defendant cannot show that even if trial counsel had sought such an expert, the trial court would have allowed the testimony, given the decision in *Linton*. Like the defendant in *Linton*, "[a]s was his right, defendant did not testify and thus did not deny the truth of his interview statements. There was no other evidence offered that logically called into question the veracity of his admissions." (*Id*. at p. 1181.) Whether to call particular witnesses is a matter of trial tactics that a reviewing court may not second-guess. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.)

Defendant offers no explanation as to what such an expert would show that was favorable to his defense, such as certain psychological factors he might possess that would have led to a false confession, or specific police tactics apart from those about which defense counsel inquired. Furthermore, CALCRIM No. 358 instructed the jury that it was free to decide whether defendant made the oral statement attributed to him in whole or in part. The jury members were told it was up to them to decide the importance of the statement and to consider it with caution unless it was recorded or written. The jury was also instructed that defendant could not be convicted based on his statement alone. (CALCRIM No. 359.) Under the circumstances of this case, the jury could understand and evaluate all of the evidence presented regarding defendant's admissions without the assistance of an expert.

A defendant must "do more than surmise that defense experts *might* have provided more favorable testimony." (*People v. Lucas* (1995) 12 Cal.4th 415, 448, fn. 5.) Defendant's ineffective assistance claim lacks merit.

22

## V.  Stipulation

### A.  Defendant's Argument

Defendant contends trial counsel's errors were compounded when he stipulated that:  "Dr. Escalona did not perform a sexual assault examination, nor did she refer [C.] for such an exam based on the length of time that had elapsed from the last incident to the date of treatment."  According to defendant, trial counsel in effect agreed that there were, in fact, multiple sexual assaults on C., which constituted conduct below reasonable professional standards and caused prejudice.

### B.  No Ineffective Assistance

We disagree with defendant.  In light of G.'s testimony and the subsequent evidence and argument presented by the defense, there was no reasonable probability that the jury would construe that defendant was admitting his guilt with this stipulation.  G. testified that the doctor's only suggested remedy for C.'s complaint was to "have her clean, take a shower and put clean clothes."  The doctor found only that C.'s "private parts" were "a little bit irritated."  After the parties stipulated, the defense called W., who testified repeatedly to the fact that C. was never left alone with defendant, which was the basis of the defense.  Furthermore, the fact that C. complained of pain only after a considerable amount of time had passed was beneficial to the defense case and detracted from the credibility of the accusations.  Finally, the need for or lack of a sexual assault examination was never an issue in this case and was not mentioned in oral argument by either party.  We believe that entering into the stipulation fell within the permissible range of trial tactics of a reasonably competent attorney.  Accordingly, the claim of ineffective assistance of counsel lacks merit.

## VI.  Cumulative Prejudice from Alleged Ineffective Assistance of Counsel

Defendant contends counsel's multiple errors at trial amounted to ineffective assistance of counsel and violations of his constitutional rights.  According to defendant, he has shown prejudice from the cumulative impact of the multiple deficiencies even if no single error significantly impaired the defense.

We have concluded that no prejudicial error occurred. Accordingly, there was no error to accrue to defendant's prejudice. (*People v. Sanders* (1995) 11 Cal.4th 475, 565; *People v. Cudjo* (1993) 6 Cal.4th 585, 630.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.